

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-19-00052-CR

———————————————————

JUSTIN MICHAEL LOVE, Appellant

V.

THE STATE OF TEXAS

_____

On Appeal from the 30th District Court
Wichita County, Texas
Trial Court No. 56,962-A

_____

Before Kerr, Birdwell, and Bassel, JJ.
Opinion by Justice Kerr

# OPINION

Passed into law in 2013 and with a 2014 effective date, the Michael Morton Act ensures that criminal defendants, witnesses, and prospective witnesses can review many of the State's discovery materials above and beyond those that are purely exculpatory, thus allowing more transparency into criminal prosecutions. *See* Tex. Code Crim. Proc. Ann. art. 39.14; *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97 (1963) (establishing State's duty to disclose exculpatory evidence). But with that expanded right come responsibilities: defense counsel cannot let a client, witness, or prospective witness have a copy of the discovery materials (except for that person's own statement), and before letting a client, witness, or prospective witness view the materials, counsel must redact the types of identifying information laid out in Article 39.14(f). *See* Tex. Code Crim. Proc. Ann. art. 39.14(f).

This appeal involves what should happen when defense counsel is sloppy with the State's discovery DVD, letting his jailed client's wife—herself a witness—take the original to review on her own, thereby creating a situation in which she surreptitiously downloaded the unredacted DVD's contents onto her own computer, and when she and defense counsel do not later agree on exactly what he told her when lending her the file.

With defense counsel's mishandling the discovery as a springboard, the State argued that defense counsel had made himself a witness or created a conflict of interest with his client in violation of the Texas Disciplinary Rules of Professional

2

Conduct, and it persuaded the trial court to disqualify Love's chosen counsel from continued representation. We must decide whether disqualification was appropriate and proportionate on the facts of this case, keeping in mind that Love's wife could have reviewed a (redacted) DVD anyway and told Love what was in the State's file—and when Love's counsel could have reviewed the file with Love himself, thereby providing Love with the same information that purportedly spurred Love to attempt witness tampering. The fact that Love's wife and defense counsel recalled comments made at the file drop-off slightly differently did not create a conflict of interest nor did it make defense counsel a necessary witness on an essential fact. We thus conclude that the trial court abused its discretion by disqualifying counsel from representing Love.

### Love's Indictment, Conviction, and Sentencing

The State indicted Love for engaging in organized criminal activity, with murder as the predicate offense. *See* Tex. Penal Code Ann. § 71.02(a)(1). Specifically, the State alleged that Love had murdered Domanic Thrasher on June 2, 2015, while participating in a combination to illegally deliver marijuana. Nearly two years after Love's codefendant Blayne Brooks was tried and sentenced to 60 years in prison, a jury found Love guilty and assessed his punishment at 50 years' imprisonment. After being sentenced, Love appealed.

3

## Appellate Issues

In the first of his three issues, Love asserts that the trial court reversibly erred by disqualifying his retained counsel. Because we sustain Love's first issue and because the error is structural, we reverse the trial court's judgment and remand the cause for a new trial without needing to reach Love's two other issues, which deal with alleged jury-charge error.

## Background

To put into context the trial court's disqualifying Love's chosen lawyer (Retained Counsel), we briefly describe the offense and its aftermath.

**A. Love, his business partner, and a go-between attempt a drug sale; the purported buyer attempts to steal the drugs instead; and before the purported buyer can make his getaway, Love's business partner shoots and kills him.**

Love and Brooks ran a marijuana business out of Love's home, which he shared with his wife, Tamilyn.

In June 2015, Love, Brooks, and go-between Whitney O'Brien were in Love's home discussing a prospective sale of two ounces of marijuana to someone who identified himself in text messages only as "E." Tamilyn and her friend Daphnee Selser were present and heard the conversation.

The prospective sale to the unknown E left the group uneasy. Marijuana normally sold for $200 to $250 an ounce, but because O'Brien and her boyfriend were late on their rent money, she quoted E an inflated price. When E made no effort to

4

negotiate a better deal—haggling being common in drug transactions—something seemed off. So to add "muscle," Love decided to go with Brooks and O'Brien to make the sale.

At the designated rendezvous, Brooks and O'Brien realized that E was former Rider High School football star Domanic Thrasher, whom both recognized from high school. Brooks knew Thrasher to be a "jackboy"—someone who robbed drug dealers—but the three proceeded with the planned sale anyway, parking Love's Suburban and letting Thrasher get into the back seat.

It went badly. Even though Love had a gun visibly displayed as a hoped-for deterrent, Thrasher grabbed the bag of marijuana and took off. As Thrasher ran, Brooks began shooting, hitting and killing him. According to O'Brien, Brooks fired at Love's urging. O'Brien retrieved the marijuana, and the three sped off. Shaken, O'Brien asked to be let out of the car, but Love threatened her.

Once back at Love's house, Tamilyn and Selser were again privy to everything Love, Brooks, and O'Brien said and did. That same afternoon, Love—along with Tamilyn, their children, and Selser—fled to Tamilyn's brother's home in Colorado.

Law enforcement eventually traced Thrasher's murder to Love, Brooks, and O'Brien through Thrasher's cell phone and an anonymous Facebook post.[1]

---

[1]Tamilyn had told her sister what had happened, and her sister anonymously posted the information on Facebook.

**B. After over a year of loyalty to her husband, Love's wife turns State witness.**

In November 2015, Tamilyn had testified to the grand jury about Brooks's and O'Brien's involvement in Thrasher's murder. Because of spousal immunity, at that time the grand jury did not hear from Tamilyn about Love's own role. Then in August 2016, before any of the three defendants had gone to trial, Tamilyn was caught delivering a felony quantity of marijuana in a drug-free zone.

The resulting indictment led to Tamilyn's facing revocation of her probation from an unrelated theft incident. To avoid going to prison, Tamilyn made a plea deal in September 2016 under which she waived her spousal privilege and agreed to testify against Love. The next month, accordingly, Tamilyn went back before the grand jury, this time to describe her husband's role in Thrasher's murder.

**C. Long before Love's wife agreed to testify for the State, Retained Counsel allowed her to possess the original DVD containing the State's Article 39.14 discovery; the State learns of this from jailhouse telephone conversations.**

Months before Tamilyn flipped in September 2016, and while Love continued to sit in jail, the State—as is customary—recorded telephone conversations between Tamilyn and Love spanning February through April 2016 during which Love asked Tamilyn to send witnesses of their acquaintance to her brother's in Colorado so that they could not testify at Brooks's first-scheduled trial and to tell those witnesses to not remember anything if the State did call them to the stand. Nothing in the record suggests that Tamilyn followed through on those requests.

Although Love was never charged with attempted witness tampering, the State anticipated using these recordings to show Love's consciousness of guilt. *See Wilson v. State*, 7 S.W.3d 136, 141 (Tex. Crim. App. 1999) (explaining that an "attempt to tamper with a witness is evidence of 'consciousness of guilt'"). Thus far, the scenario is straightforward.

But another matter complicated the State's using the recordings.

Toward the end of December 2015 and in keeping with its disclosure obligations under the Michael Morton Act, the State had turned over discovery materials to Retained Counsel by giving him a DVD containing witness statements and other case information. Instead of having Tamilyn view this file in the controlled environment of his office, in early February 2016 Retained Counsel simply dropped the DVD off for Tamilyn to review and later return. Retained Counsel did not first redact certain information as Article 39.14(f) requires, nor did he ensure that Tamilyn could retain a copy only of her own witness statement, as the statute allows. *See* Tex. Code Crim. Proc. Ann. art. 39.14(f).[2]

---

[2]Article 39.14(f) provides:

> The attorney representing the defendant . . . may allow a defendant, witness, or prospective witness to view the information provided under this article, but [the attorney] *may not allow that person to have copies of the information provided, other than a copy of the witness's own statement.* Before allowing that person to view a document or the witness statement of another under this subsection, the person possessing the information *shall redact the address, telephone number, driver's license number, social security*

During a conversation with Love on February 8, 2016, which was apparently the day she got the DVD, Tamilyn told Love that she was not supposed to have the discovery disk. Tamilyn was recorded that February day as saying,

> I'm on my way to Walmart to get a charger for this laptop because even though it's highly not allowed, [Retained Counsel] is going to release this dis[k] to me for two days because he said it will take me eight hours to read everything and it would be best I do it. Neither him nor I have eight hours to set in the office and go over it all.
>
> . . . .
>
> He just said under . . . . He said do not lose it because if you do I'll fly blind because I can't get another one and he said do not tell that you have it because it is so not okay.

Love instructed Tamilyn to save the file on "Granny's" computer; in a later conversation that day, Love told Tamilyn to make copies of the file so that she could give the disk back to Retained Counsel. Before returning the discovery disk to Retained Counsel, and without his knowledge, Tamilyn did indeed download the entire file.

The chief investigator for the Wichita County District Attorney's office, who was monitoring the jail calls, determined at the time, as he wrote in his later report, that "if Tamilyn's statements [on February 8, 2016] about [Retained Counsel] were true, it would be a violation of CCP 39.14(f)."

---

*number, date of birth, and any bank account or other identifying numbers contained in the document or witness statement.*

*Id.* (emphases added).

Although the record is silent about why the State did not immediately alert the trial court to conduct that it has characterized as "illegal," the State now knew of a discovery violation, the original source of which was Retained Counsel. Over multiple conversations throughout the spring of 2016, Tamilyn read or described to Love much of the file's contents.[3]

**D.**  **The State notifies the trial court of a "Potential 39.14 Violation by Defense Counsel Tendering a Copy of the File to an Unauthorized Third Party."**

Tamilyn cut her deal in September 2016, and in October the State filed its notice of the potential Article 39.14 violation that had occurred some eight months earlier. That notice was couched exclusively in terms of subsection (e), which prohibits disclosing discovery to an unauthorized "third party," rather than subsection (f), which deals with witnesses and prospective witnesses such as Tamilyn.[4] Not (yet) raising the specter of disqualification, the State wrote that it

---

[3]At some point, she also read part of the discovery to fellow witness Selser and shared a portion with a former employer who was writing a story and "needed crime lingo."

[4]The difference between (e) and (f) is significant. Under the former, without a court order defense counsel cannot disclose *anything* nonpublic to a "third party"; the latter subsection, in contrast, allows the defendant, witnesses, and prospective witnesses to review the State's discovery, with some limitations. In our view, Tamilyn was never an "unauthorized third party" for Michael Morton Act purposes despite the State's frequently characterizing her that way. By the time of the disqualification hearing, as we explain later, the State acknowledged that she was a witness entitled to review discovery materials. In its briefing to us, the State glosses over these conflicting positions and lumps together citations to both (e) and (f).

9

believe[d] that the Court should be placed on notice of this potential violation of 39.14(e) by [Retained Counsel] so the Court can conduct whatever inquiry and take whatever actions that it wishes. Section 39.14, as a discovery provision, empowers and entrusts the protection of this critical information with the Court, as the Court is in charge of the discovery process.

The State attached the chief investigator's report to its notice; as we mentioned, the investigator cited the very different Article 39.14(f), not (e). The reasons for the discrepancy are not apparent.

## E. After Brooks's trial, Love moves to change venue out of Wichita County.

The murder of a former Wichita Falls high-school football star had understandably generated much publicity in the local media at the time, as did Brooks's November 2016 trial and the run-up to it. Newspaper accounts and televised reporting frequently recounted O'Brien's assertion that it was Love who had told Brooks to shoot Thrasher, as well as Love's threats toward O'Brien if she had tried to get out of the car or if she talked to the police. Televised portions of Brooks's trial that are in the record include a clip of Brooks's mother testifying about the sway that Love held over her years-younger son and several defense witnesses testifying that Love controlled Brooks's actions.

Shortly after Brooks was sentenced, local media turned to reporting the State's offer of a 50-year plea deal to Love, its December 31, 2016 deadline, and his rejection of that offer.

10

In addition to all these (and more) examples of pretrial publicity that, Love argued, had ruined his ability to get a fair trial in Wichita County, Love included two sentences at the end of his change-of-venue motion describing what he captioned "Publicity Surrounding Defendant's Counsel":

> It was further reported on the news, radio and texomas [sic] home page[5] that the State has asked the Court to investigate Love's lawyer because he reportedly gave discovery documents to Love's wife. It was reported on the news, radio and texoma's [sic] home page that counsel has been arrested twice before.

Love quoted one online news article referring to Retained Counsel's "less than . . . stellar reputation" while reporting that Retained Counsel had once been "arrested for hitting another man in the face with a beer mug at Old Town Saloon and also arrested for allegedly showing up drunk and naked to a woman's house a year after he ran for District Attorney."[6]

With regard to Love's claim of damaging publicity about Retained Counsel, the State's response to Love's venue motion did not address either the discovery violation or counsel's earlier brushes with the law, relying instead on the fact that Retained Counsel was continuing to receive felony appointments: "Naturally, if [Retained Counsel's] reputation were so bad that he could not effectively represent defendants

---

[5]"Texoma's Homepage" is the website of local NBC and Fox affiliates KFDX and KJTL. *See* www.texomashomepage.com (last accessed March 4, 2020).

[6]That same article picked up on the State's view that Retained Counsel had "illegally" given Tamilyn a discovery disk.

in Wichita County, then [Retained Counsel] would have withdrawn from the felony appointment list or the district judges would have stopped appointing him."

The State's suggested fix for all of Love's pretrial-publicity concerns—the vast majority of which related to Love himself—was for the trial court to leave it to jury selection to gauge whether a fair jury could be selected in Wichita County. "If the defendant's claims about publicity are correct, then that would be evident at voir dire."

In questioning the district attorney's chief investigator toward the end of the venue hearing about Retained Counsel's reputation, the State asked:

> So do you believe that jury selection would also be an important tool to show whether these claims about [Retained Counsel's] reputation being so bad that he cannot adequately represent this Defendant to a Wichita County jury, that that would be exposed in jury selection whether that's true or false?

The investigator agreed that would be true "if the questions are asked."

The trial court recessed the May 15, 2017 venue hearing to finish at a later date. In the roughly 130-page transcript of that hearing, the topic of the discovery violation came up on six pages, and only briefly at that.

**F.     Three days after the venue hearing is recessed, the State moves to disqualify Retained Counsel.**

On May 18, three days later, the State moved to have Retained Counsel disqualified. The State contended that his "unauthorized tendering of the State's file to Tamilyn Love, an unauthorized third party" who had "illegally obtained possession

12

of the file" put Retained Counsel in the dual role of advocate and witness and "so entangled" him in the proceedings that a conflict between Love's and Retained Counsel's interests existed.

In the State's view, the discovery violation would inevitably become an issue at trial: in order to show that Love had attempted to tamper with witnesses and that he had had access to the discovery file through Tamilyn's reading it to him, the State would have to show how Tamilyn came to "illegally" possess the DVD in violation of Article 39.14(e), something that would inescapably involve Retained Counsel's actions. The State relied on Rule 3.08 of the Texas Disciplinary Rules of Professional Conduct ("Lawyer as Witness") and to a much lesser degree also on Rule 1.06 ("Conflict of Interest").[7] *See* Tex. Disciplinary Rules Prof'l Conduct RR. 1.06, 3.08, *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G, app. A.

As with its earlier notice, the State cited only Article 39.14(e) as the basis for its motion and indirectly explained why it had not sought disqualification earlier by asserting that

> [t]his conflict became unmistakably clear to the State at the motion to transfer venue hearing on May 15, 2017, when the defense attorney developed testimony from [Love's mother] and the defendant concerning the discovery violation and implied that the prosecutor was striking at the defense attorney's reputation by documenting the violation on the record in open court without seeking any affirmative

---

[7]In its 11-page motion, the State devoted two short paragraphs at the end to Rule 1.06.

sanctions. [Criminal-defense attorney] Mr. [Robert] Estrada, a defense witness, also alluded to this.

The State was referring to the following testimony: at the venue hearing, Retained Counsel had asked Love's mother one question about the discovery violation: "Did you also see newscasts or articles about -- about -- about me -- about notice given to the Court that I had reportedly violated discovery rules?" She answered, "Yes." In the course of questioning Love, Retained Counsel had asked whether, at the December 9, 2016 hearing at which the plea offer was discussed and reported on (and the discovery violation mentioned), the prosecutor had "request[ed] any kind of relief or sanctions that day other than saying that [the discovery-violation notice] had already been filed," to which Love answered, "No." Love also testified that he had seen newscasts that same day reporting Retained Counsel's alleged violation, and "before [Love] knew it the 6 o'clock [news] not only had that [Love] came to court, had the [plea] offer, but then it had [Retained Counsel's] mugshot on the screen on Channel 3 and talked about [Retained Counsel's] criminal history and the alleged violation of the 39.14(e)."

Finally, Attorney Estrada testified at the venue hearing about pretrial publicity involving Love and was asked one question by Retained Counsel about the discovery violation: "Are you aware that there was also a motion filed and it was stated on the record that the district attorney's office suspected me [of] improper conduct with regard to discovery?" Estrada responded, "Only from what I read." Estrada did not

testify that the publicity surrounding Retained Counsel contributed to his opinion that Love could not get a fair trial in Wichita County, pointing instead to—

- the fact that Domanic Thrasher had been a high-school football star, adding that "Hollywood would not be able to come up with a better name for a high school football player in Texas";

- the popularity of football in Wichita Falls, the rivalries between Thrasher's high school and other schools, and "kids grow up wanting to play football"; and

- media reports of witness testimony at Brooks's trial about Love, "because it's already out there. It can't be unsaid."

During the State's cross-examination of Attorney Estrada at the venue hearing, it continued the subsection (e) theme that Retained Counsel had no right whatever to disclose the discovery file to Tamilyn:

> Q.     Now, you're familiar with the discovery provisions of the Code of Criminal Procedure 39.14, aren't you?
>
> A.     Yes.
>
> Q.     Especially 39.14(e) that prohibits disclosure of the file to an unauthorized third party without prior court permission.
>
> A.     That's right.
>
> . . . .
>
> Q.     . . . If I represent to you that my investigator learned that the defense attorney in this case had tendered the file to an unauthorized third party and that that third party was engaging in borderline witness tampering type behaviors and I had that information, that's certainly something I had a duty to notify the Court of?
>
> A.     And I believe you did.

In his initial response to the State's disqualification motion, Love called the issue of "how Tamilyn Love came into the possession of the file . . . a red herring." The State filed a reply, which Love answered in a further response filed the day of the disqualification hearing, May 26, 2017.

Love's May 26 "Response to the State's Reply to Defendant's Response to the Motion to Disqualify" contains the first explicit observation that Tamilyn could in fact "view the information provided" under the Michael Morton Act, as Article 39.14(f) states, because she "was and is a witness in this case," as Love noted. Thus, only on the day of the hearing was the trial court pointed to something other than the State's absolutist subsection (e) position.

In preliminary remarks before the trial court began hearing testimony, Retained Counsel put the matter in a nutshell: "They are saying that she illegally obtained a file. . . . If she didn't illegally obtain it, then there's no basis for disqualifying me."

The disqualification hearing saw the State now raise the subsection (f) redaction issue for the first time:

> Q.   Had you reviewed that disk before you gave -- relinquished it to her?
>
> [Retained Counsel:] I think I skimmed a little bit of it, but I had not reviewed it thoroughly.

Q.     And what did -- what redactions did you make to that disk before you released it to her?[8]

A.     I don't know how to redact a disk. So I didn't make any redactions.

Q.     And when you gave it to her, you told her something to the effect, it's highly not allowed for me to give this to you and don't tell anyone that you have it because it is not okay?

A.     I did not tell her that.

Q.     In fact, you also told her that, if you lose it, I'll have to fly blind because I can't get another disk?

A.     That's correct. Because I gave her my actual DVD.

Q.     Okay. And normally if you had misplaced that DVD, you could request another one from the DA's office, couldn't you?

A.     I don't know if I could get one, but I could request one.

Despite the State's now asking about redactions, it continued to blur the subsection (e)/(f) distinction: the State's next question was whether Retained Counsel knew that he could not request another DVD because he "knew that what [he] did was in violation of 39.14(e)?" Retained Counsel answered, "No." And when later asked if he had ever "reported to the Court the fact that [he] released that disk to an

---

[8]Nothing in the monitored jail calls between Tamilyn and Love had even hinted at a redaction issue, so the State's question marks the first time it implied that a failure-to-redact violation of subsection (f) was as "illegal" or improper as releasing discovery materials to an unauthorized third party under subsection (e). As noted, the State's October 2016 notice of a potential Article 39.14 violation relied wholly on subsection (e).

unauthorized third party," Retained Counsel responded: "I am going to object. I don't believe she's an unauthorized third party . . . ."

Testifying at the disqualification hearing in narrative form on cross-examination, Retained Counsel explained further:

> It's my belief that, as a witness, she could view the actual DVD that [the prosecutor] tendered to me. She could do it in my office. I'm not going to sit in there with her. Nobody has time to sit in there with her. I'm not going to search her purse. I'm not going to strip search her. If she is going to violate, she is going to violate it; she is going to take pictures of it. I trusted her, because she was [Love]'s wife, to look at it. She didn't have time to come into the office and sit there. It was a pretty lengthy disk, I think. And so I trusted her to do -- to look at it, bring it back to me, not to disclose it to anybody else or make any copies. So I believe any -- I believe she had the right to review the file, the actual DVD. I did not make a copy of the actual DVD and give it to her.

Retained Counsel maintained that he took precautions by giving Tamilyn explicit instructions: "I told her that she couldn't lose it, that she couldn't make copies of it, that she couldn't let anybody else see it, that she needed to look at it and bring it back to me." For her part, Tamilyn had this to say about having gotten the DVD in February 2016:

> Q.    And did [Retained Counsel] give you the disk, the discovery disk, the initial discovery disk in this case?
>
> A.    He did.
>
> Q.    And when he gave you that disk, did he make a statement to you something of the effect that, it's highly not allowed for me to release this disk to you?
>
> A.    He did inform me, yes.

18

Q.    Did he tell you to not tell anyone that you had it because it's so not okay?

A.    Something along those lines. I think those are my words. But yes.

On being cross-examined by Retained Counsel, Tamilyn agreed that she knew he had given her his "one and only DVD," that he did not make a copy of his DVD and give it to her to keep, and that he told her he "had to have it back." Tamilyn also agreed that Retained Counsel had had no reason not to trust her with the original and that he had not suggested that she should "influence any witnesses" or "tell people not to come to the trial or avoid service."

Under questioning at the hearing, the chief investigator agreed with Retained Counsel that "witnesses can review the discovery materials that y'all give to [defense counsel]," answering, "They can review them, yes, with stipulations." The investigator also acknowledged that all the witnesses' addresses were public record.[9]

In his closing remarks, Retained Counsel noted that in seeking his disqualification, the State had to show that it would suffer "actual prejudice" if he continued to represent Love; that there were "no adequate measures" the trial court could take short of disqualifying him; and that a "compelling need, that it's essential

---

[9]Addresses are among the identifying information that must be redacted under subsection (f). By all accounts, all the witnesses whom Love urged Tamilyn to send to Colorado to avoid testifying at Brooks's trial were known to both of them.

and not just relevant," existed for Retained Counsel's testimony at trial. As for the

substance of that theoretical testimony, Retained Counsel summed up:

> [W]hat am I going to testify about? She can look at this information, Judge. So there's no issue before the jury. By law, she can look at it and so there's -- whether it is in my conference room, whether it's in my office, whether it's in my reception room or wherever, she can look at this information. So she has access to this information, Judge. The witnesses are all out there. Their names are out there and addresses. So there's no issue, Judge.

The trial court granted the State's motion and disqualified Retained Counsel

with the following order:

> After considering the evidence, authority, and argument of counsel in the pending motion to disqualify, I make the following findings:
>
> 1. By improperly disclosing the discovery file to Tamilyn Love, [Retained Counsel] has made himself a likely witness in the trial of Justin Love.
>
> 2. As a witness, [Retained Counsel] would find himself in the dual role of advocate and witness. He is prohibited from serving in that dual role.
>
> 3. Should the defense attempt to prevent or limit the State's ability to question [Retained Counsel] about his role and/or motive in the discovery violation, such an attempt would impermissibly hamper the State's case.
>
> 4. Even if not called to testify under oath, [Retained Counsel] would, in all likelihood, become an "unsworn witness" as discussed in *Gonzalez v. State*.
>
> 5. [Retained Counsel]'s actions have created a conflict between himself and his interests and those of the defendant.
>
> The State's motion to disqualify [Retained Counsel], as trial counsel, is GRANTED.

This order does not indicate whether the trial court concluded that the "improper disclosure" referred to in its paragraph 1 stemmed from a subsection (e) violation, as the State had consistently maintained, or from a subsection (f) violation, something that was new to the mix on the day of the disqualification hearing.

### ISSUE ONE: DISQUALIFICATION OF COUNSEL

### Applicable Legal Principles

Because the State initially argues that Love did not preserve error on the disqualification issue, we address that aspect of the State's argument first.

**A.    Love preserved his first issue for appeal.**

Love argues that the trial court reversibly erred by ordering Retained Counsel's disqualification "based on a conflict of interest between [Love] and his counsel under Texas Disciplinary Rule of Professional Conduct 3.08." The State suggests that Love waived the issue by attacking only one of the two grounds ostensibly underpinning the trial court's order. That is, the State asserts that the order—although it cites no particular disciplinary rule—relied both on Rule 1.06 ("Conflict of Interest") and on Rule 3.08 ("Lawyer as Witness") but that Love's first issue attacks only the Rule 3.08 ruling and so must be overruled.

Love's brief never specifically cites Disciplinary Rule 1.06, but Love does repeatedly refer to a "conflict of interest" between himself and Retained Counsel; following are some of the examples:

21

- "Though this Court has adopted *Gonzalez v. State*, 117 S.W.3d 831 (Tex. Crim. App. 2003)[,] it has not had the opportunity to apply the holding to a situation where the trial court disqualified a party's attorney on the motion of an opposing party based on a conflict of interest."

- "The State filed a motion to disqualify [Retained Counsel] from representing Love claiming that relinquishing the file to Tamilyn . . . created a conflict between him and Love."

- "The trial court ruled [Retained Counsel]'s discovery file violation created a conflict between him and Love under Tex. Disciplinary R. Prof'l Conduct 3.08. The court determined that the State suffered harm based on the Texas Court of Criminal Appeals decision in *Gonzalez v. State*, 117 S.W. 3d 831 (Tex. Crim. App. 2003)."

- "Despite the fact that . . . the State's case suffered no actual prejudice by the alleged conflict between Love and his attorney[,] the trial court removed [Retained Counsel] from the case. By removing . . . Love's retained attorney from the case under the guise of a 'conflict of interest' the trial court sanctioned the weaponization of the rules of professional conduct."

- "The State is not permitted to use a conflict between a defendant and his attorney to reap an advantage through disqualification. The party seeking disqualification must demonstrate actual prejudice resulting from opposing counsel's service in the dual role of advocate-witness. Nothing about [Retained Counsel]'s possible conflict with Love would limit the State's ability [to] pursue its case." [footnotes omitted]

From this, we conclude that Love's brief does not ignore the conflict-of-interest issue.

Moreover, Disciplinary Rules 1.06 and 3.08 are not mutually exclusive. Rule 3.08 encompasses aspects of Rule 1.06—that is, conflict-of-interest concerns are present in Rule 3.08, even if secondarily. For example, Rule 3.08(b) provides: "A lawyer shall not continue as an advocate in a pending adjudicatory proceeding if the lawyer believes that the lawyer will be compelled to furnish testimony that will be substantially adverse to the lawyer's client, unless the client consents after full

22

disclosure." *See* Tex. Disciplinary Rules Prof'l Conduct R. 3.08(b). And comment 10 to Rule 3.08 addresses conflicts of interest: "[A] lawyer should not seek to disqualify . . . opposing [counsel] under . . . Rule [3.08] merely because the opposing lawyer's dual roles may involve an improper conflict of interest with . . . the opposing lawyer's client, for that is a matter to be resolved between lawyer and client or in a subsequent disciplinary proceeding." *Id.* R. 3.08 cmt. 10. Although the two rules admittedly have different focuses, a Rule 3.08 analysis necessarily implicates some Rule 1.06 concerns.

Next, the State argues that to the extent Love's brief addresses Rule 1.06, his briefing is inadequate. We disagree. Love's brief goes beyond just lawyer-as-witness concerns; it acknowledges conflict-of-interest issues and cites *Wheat v. United States*—a pure conflict-of-interest case—three times. *See* 486 U.S. 153, 108 S. Ct. 1692 (1988). The Texas Court of Criminal Appeals has cited *Wheat* for the proposition that a party moving to disqualify opposing counsel must show an actual conflict or a serious potential for conflict. *Bowen v. Carnes*, 343 S.W.3d 805, 812 (Tex. Crim. App. 2011) (orig. proceeding) (quoting *Wheat*, 486 U.S. at 164, 108 S. Ct at 1700). And even the Rule 3.08 case on which both Love and the State rely extensively, *Gonzalez v. State*, cited *Wheat* for the same proposition. 117 S.W.3d 831, 844 (Tex. Crim. App. 2003). Love also argues that remedies other than disqualification were available and that any conflict between himself and Retained Counsel was not the State's concern unless the

State could show actual prejudice. In short, Love did not ignore or fail to adequately brief the conflict-of-interest concerns.

We are to construe briefs liberally. Tex. R. App. P. 38.1(f) ("[T]he statement of an issue or point will be treated as covering every subsidiary question that is fairly included."), 38.9 (requiring courts to liberally construe briefs for substantial compliance with rules). Thus to the extent, if any, that the trial court relied on Rule 1.06, we conclude that Love's brief encompasses Rule 1.06, and to the extent that the trial court did not rely on Rule 1.06, Rule 1.06's concerns are subsumed within a Rule 3.08 analysis—on these facts at least. Regardless, as we noted, Love did address conflict-of-interest concerns in his brief. *See, e.g.*, *Barnett v. State*, 161 S.W.3d 128, 132 (Tex. App.—Fort Worth 2005) (noting principle that briefs should be liberally construed to serve the interests of justice), *aff'd*, 189 S.W.3d 272 (Tex. Crim. App. 2006). We hold that Love preserved his first issue and so will analyze its merits.

**B.     We apply an abuse-of-discretion standard of review.**

When the trial court disqualifies an attorney, we review its decision for an abuse of discretion. *See Landers v. State*, 256 S.W.3d 295, 303 (Tex. Crim. App. 2008). But even under this standard, sometimes the review is highly deferential and other times not. When reviewing factual determinations, we defer almost totally to those trial-court findings that the record supports, especially when the findings turn on evaluating credibility and demeanor. *Id.* But when reviewing how the trial court applied the law to the facts, we use the no-deference de novo standard. *Id.*

**C.** **Although the right is not limitless, defendants have the right to choose their retained counsel, and the State's burden in getting chosen counsel removed is thus a heavy one.**

When it comes to a paid attorney,[10] a defendant has the right to choose his own counsel, although that right is not absolute. *Gonzalez*, 117 S.W.3d at 836–37; *Trammell v. State*, 287 S.W.3d 336, 342–43 (Tex. App.—Fort Worth 2009, no pet.). For example, a defendant has no right to an advocate who is not a member of the bar, to an attorney whom the defendant cannot afford, to an attorney who declines to represent him, or to an attorney who has a previous or an ongoing relationship with an opposing party. *Gonzalez*, 117 S.W.3d at 837. While a strong presumption favors a defendant's right to retain counsel of choice, other important considerations—such as the judicial process's integrity and justice's fair and orderly administration—may override this presumption. *Id.*

If a trial court unreasonably or arbitrarily interferes with a defendant's right to choose his own counsel, its actions rise to the level of a constitutional violation. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150, 126 S. Ct. 2557, 2564 (2006) (holding that "erroneous deprivation of the right to counsel of choice, with consequences that are

---

[10]"A clear distinction exists between paying clients and indigent defendants. Because paying clients may contract for representation from the lawyer of their choice, they are free to accept or reject representation by a lawyer after having been informed of a conflict of interest." *Haley v. Boles*, 824 S.W.2d 796, 798 (Tex. App.—Tyler 1992, no pet). "However, an indigent defendant is assigned the lawyer who will represent him. The indigent defendant's consent to continued representation under Rule 1.06(c)(2) does not embody the same degree of free choice as that of the paying client." *Id.*

necessarily unquantifiable and indeterminate, unquestionably qualifies as structural error") (cleaned up); *Gonzalez*, 117 S.W.3d at 837; *cf. Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 443, 105 S. Ct. 2757, 2767 (1985) (Stevens, J., dissenting on other grounds) ("[I]n a criminal case an erroneous order disqualifying the lawyer chosen by the defendant should result in a virtually automatic reversal."). Thus, in disqualifying defense attorneys, courts must proceed carefully—"especially if less serious means would adequately protect the government's interests." *Gonzalez*, 117 S.W.3d at 837.

**D.  Disciplinary Rule 3.08 does not warrant disqualifying counsel unless the lawyer's testimony is "necessary" to an "essential fact"; if so, the opposing party must still show that it will be prejudiced if the lawyer is not removed.**

Disciplinary Rule 3.08 warns that a lawyer should not accept or continue employment if the lawyer knows or believes that he "is or may be a witness necessary to establish an essential fact." *See* Tex. Disciplinary Rules Prof'l Conduct R. 3.08(a). In determining whether defense counsel should be disqualified due to the risk of becoming a witness, Texas courts use Disciplinary Rule 3.08 as a guideline. *Gonzalez*, 117 S.W.3d at 837. That rule does not present the disqualification standard but provides relevant considerations. *Id.* at 837–38; *see also Johnson v. State*, 352 S.W.3d 224, 229 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) ("Rule 3.08 was promulgated as a disciplinary standard, and not a procedural rule for attorney disqualification. . . . Nevertheless, Texas courts often reference the Rule as a guideline when determining whether a lawyer should discontinue his representation of a client.").

26

In civil cases involving Rule 3.08, our supreme court has noted that "'[d]isqualification is a severe remedy'" and "is a measure that can cause immediate harm by depriving a party of its chosen counsel and disrupting court proceedings." *In re Sanders*, 153 S.W.3d 54, 57 (Tex. 2004) (orig. proceeding) (quoting *Spears v. Fourth Court of Appeals*, 797 S.W.2d 654, 656 (Tex. 1990) (orig. proceeding)) (citing *In re Nitla S.A. de C.V.*, 92 S.W.3d 419, 423 (Tex. 2002) (orig. proceeding)). "Mere allegations of unethical conduct or evidence showing a remote possibility of a violation of the disciplinary rules will not suffice," then, to merit disqualification. *Spears*, 797 S.W.2d at 656. Moreover, the "fact that a lawyer serves as both an advocate and a witness does not in itself compel disqualification." *Sanders*, 153 S.W.3d at 57 (citing *Ayres v. Canales*, 790 S.W.2d 554, 557–58 (Tex. 1990) (orig. proceeding); *In re Chu*, 134 S.W.3d 459, 464 (Tex. App.—Waco 2004, orig. proceeding); *May v. Crofts*, 868 S.W.2d 397, 399 (Tex. App.—Texarkana 1993, orig. proceeding)).

As the *Sanders* court observed, disqualification is appropriate only if the lawyer's testimony is "'necessary to establish an essential fact.'" *Id.* (quoting Tex. Disciplinary Rules Prof'l Conduct R. 3.08(a)). It is the movant's burden to show that opposing counsel's testimony will be necessary. *See Gonzalez*, 117 S.W.3d at 838; *In re Garza*, 373 S.W.3d 115, 118 (Tex. App.—San Antonio 2012, orig. proceeding). The party requesting disqualification must also show that the opposing lawyer's dual roles as attorney and witness will cause the party actual prejudice. *See Gonzalez*, 117 S.W.3d at 837; *see also Sanders*, 153 S.W.3d at 57. "Without these limitations, the rule could be

improperly employed 'as a tactical weapon to deprive the opposing party of the right to be represented by the lawyer of his or her choice.'" *Sanders*, 153 S.W.3d at 57 (quoting Tex. Disciplinary Rules Prof'l Conduct R. 3.08 cmt. 10 (stating that a lawyer "should not seek to disqualify an opposing lawyer by unnecessarily calling that lawyer as a witness")); *see also House v. State*, 947 S.W.2d 251, 253 (Tex. Crim. App. 1997) ("The rules should not be used as a tactical weapon to disqualify opposing counsel for their alleged disciplinary rule violations . . . ."); *In re Bahn*, 13 S.W.3d 865, 873 (Tex. App.—Fort Worth 2000, orig. proceeding) (stating that courts "must adhere to an exacting standard when considering motions to disqualify so as to discourage their use as a dilatory trial tactic").

In a criminal matter, when moving to kick defense counsel off a case based on counsel's putatively being both advocate and witness, the State bears a "heavy burden" to justify the disqualification. *Gonzalez*, 117 S.W.3d at 837. The State must demonstrate "actual prejudice,"[11] and showing only a possible future disciplinary-rule violation does not suffice. *Id.* Moreover, the party seeking disqualification cannot invite or concoct the requisite actual-prejudice scenario by unnecessarily calling

---

[11]Recognizing that criminal defendants enjoy constitutional rights not possessed by the State, the *Gonzalez* court acknowledged the "meager" caselaw concerning "what it means for the State to demonstrate actual prejudice arising from a defense counsel's violation of Rule 3.08." *Id.* at 839. Ultimately sidestepping the question, the Texas Court of Criminal Appeals simply assumed that the State would have to satisfy the harmful-error standard of appellate-procedure rule 44.2(b)—that is, that the State must "show that its 'substantial rights' would be affected by an opposing attorney's alleged ethical violation." *Id.* at 840.

defense counsel as a witness. *Id.* at 838; *cf. Flores v. State*, 155 S.W.3d 144, 149 (Tex. Crim. App. 2004) (noting that "putting defense counsel in the position of a prosecution witness is something that 'should be avoided whenever possible'" (quoting *Venable v. Maryland*, 108 Md. App. 395, 405, 672 A.2d 123, 128 (1996) (quoting *Kaeser v. Nevada*, 96 Nev. 955, 958, 620 P.2d 872, 874 (1980)))).

## E. Article 39.14 contains no built-in sanctions or remedial measures for a defense counsel's mishandling the State's discovery disclosures.

The Michael Morton Act was designed to ensure that a defendant can discover, on request, the "evidence material to any matter involved in the action." *See* Tex. Code Crim. Proc. Ann. art. 39.14(a). The statute allows defense counsel to show clients, witnesses, and prospective witnesses the State's file, with certain information redacted, and to give them a copy of their own statements to keep. *See id.* art. 39.14(f). The Act does not include any mechanisms for dealing with discovery violations on defense counsel's part, such as making those violations a ground for disqualification.

The Michael Morton Act's silence on this score is apparently a feature, not a bug:

> Though potential sanctions (against both sides) were proposed and discussed in the formulation of the legislation, it was ultimately decided that such matters were better not specifically addressed. Frankly, both prosecutors and defense lawyers were leery about the application of express sanction. In the end, the consensus was that since courts already possess the inherent power to order remedial and sometime[s] punitive (non monetary) sanctions, it was best left to the remedies that already existed rather than trying to write a set of rules or guidelines that could produce unintended consequences for both sides.

29

W. Troy McKinny, *Criminal Discovery in Texas—2014: The Beginning of a Brave New World of Fairness* 8 (State Bar of Texas 40th Annual Advanced Criminal Law Course, Ch. 10, 2014), http://www.texasbarcle.com/Materials/Events/13098/168130_01.pdf (last visited Mar. 10, 2020).

Another commentator has observed that the Michael Morton Act "[c]uriously" fails to "create a crime or other sanction for violation of its nondisclosure requirement." Gerald S. Reamey, *The Truth Might Set You Free: How the Michael Morton Act Could Fundamentally Change Texas Criminal Discovery, or Not*, 48 Tex. Tech L. Rev. 893, 916 (Summer 2016). In Professor Reamey's view, this void

> presents a challenge for the trial judge. If an attorney . . . misbehaves by improperly disclosing information obtained from the state, the court might refer the matter for possible attorney discipline or hold the lawyer in contempt if the court's order was violated. Presumably, a sanction might issue using the court's general supervisory powers.

*Id.* (footnotes omitted).[12]

_____

[12]Along the same lines is a paper written after the Act had been in place for a year, cataloging how district attorneys around the state were dealing with the new requirements. Some offices reported that if defense counsel violated Article 39.14, they would respond by restricting future defense counsel access to information—unilateral sanctions against defense counsel that the paper calls "improper" and "rife with the potential for abuse. If a prosecutor believes that a defense lawyer has violated the Morton Act, the proper recourse is to draw this violation to the presiding court's attention, and in egregious circumstances, report the conduct to the State Bar." *Towards More Transparent Justice: The Michael Morton Act's First Year* 29 (2015), http://texasdefender.org/wp-content/uploads/Towards_More_Transparent_Justice.pdf (last visited Mar. 10, 2020).

On the flip side, some defense counsel find that the new disclosure rules create logistical headaches. A 2015 analysis conducted for the Texas Criminal Defense Lawyers Association yielded these (and other similar) comments:

Article 39.14's framework thus does not explicitly contemplate that a court can disqualify an attorney for a subsection (f) violation in and of itself.

## Applying the Legal Principles

So what might it take for a discovery violation to warrant defense counsel's disqualification? According to the State, if a violation puts a defendant crosswise with his counsel by placing counsel in the Rule 3.08 dual position of being both witness and advocate or by foreclosing counsel from pursuing some otherwise reasonable trial strategy because it might expose his role in the discovery violation (thus making counsel's interests conflict with his client's under Rules 3.08 or 1.06 or perhaps both),

---

- "Significant time is required to review discovery with clients and their families because giving copies to them is no longer allowed."

- "In the old days, when we had to go and write everything down in the DA's office, I could still take the damn thing and give it to my client, and at least they read what I wrote, so they knew what was there. Now, I'm supposed to not only redact the damn thing, I'm also supposed to not let them hold onto it. How much time in a day do you have to do that kind of hand-holding? It doesn't exist."

*The Cost of Compliance: A Look at the Fiscal Impact and Process Changes of the Michael Morton Act* 45, 46 (March 2015), http://www.tcdla.com/Images/TCDLA/%20 Temporary%20art/MMA%20Final%20Report.pdf (last visited Mar. 10, 2020). Lubbock County defense attorneys had similar complaints, as a June 2016 article appearing in *Lubbock Law Notes* reveals: "[M]any Lubbock criminal defense lawyers eschew the redaction process and simply read discovery to clients, omitting identifying information; others prepare written summaries of discovery which can be given to clients to keep and study on their own time. A few lawyers admitted ignoring the non-disclosure and redaction rules." Chuck Lanehart & Charles Blevins, *The Michael Morton Act Revisited* ¶ 5, https://lubbockcriminaldefense.com/2016/06/01/the-michael-morton-act-revisited/ (last visited Mar. 11, 2020).

then the defendant cannot keep his chosen lawyer. Although we agree in theory with the State's position, the facts here are materially different from *Gonzalez v. State*, the leading Texas case on defense-lawyer-as-witness disqualification.

There, Gonzalez (a physician) and several others were indicted for engaging in organized criminal activity involving an insurance-fraud scheme tied to staging car accidents and billing for nonexistent medical treatment. One of the State's key witnesses had participated in the scheme, first as a car-wreck "victim" and then as an employee in Gonzalez's clinic. After the indictments were handed down, the witness spoke and met with Gonzalez's defense counsel and others several times, resulting in an agreement—to which counsel was privy—by which Gonzalez would pay the witness $10,000. The reason for the offered payment was hotly contested. *Gonzalez*, 117 S.W.3d at 835.

Arguing that defense counsel had "personal knowledge bearing directly on the guilt or innocence of his client and the credibility of the State's key witness," *id.*, the State succeeded in moving to disqualify counsel under Rule 3.08. *Id.* at 836. Gonzalez appealed his subsequent conviction, contending that the trial court had wrongly deprived him of his chosen lawyer. *Id.* The court of criminal appeals rejected that argument because defense counsel's personal knowledge of and involvement with a promised payment that the State argued was meant to bribe a witness went to the core of the prosecution:

> [T]he State intended to introduce evidence about which defense counsel had personal knowledge. The fact that defense counsel had personal knowledge would become obvious through the testimony of the State's witness. This evidence, an allegation that defendant, through his attorney, attempted to bribe a witness for favorable testimony, was not merely tangential to the case or to defendant's guilt, but would support an inference that such conduct demonstrated defendant's consciousness of guilt for the crime charged.

*Id.* at 842. We see the *Gonzalez* defense counsel's clear entanglement with a material, disputed issue as a far cry from Retained Counsel's situation.

**A.    The discovery violation and Tamilyn's and Retained Counsel's differing recollections were tangential not only to the State's case against Love but also to the State's wanting the jury to learn about Love's witness-tampering comments.**

Because proving that Love committed the charged offense of organized criminal activity did not require proving the discovery violation or anything relating to Tamilyn's possessing, downloading, or partially sharing the State's file, the Article 39.14(f) situation had only glancing importance to the State. *See Harrison v. State*, 788 S.W.2d 18, 23 (Tex. Crim. App. 1990) (holding that trial court erroneously declared mistrial based on defense counsel's cross-examining police officer on matter within counsel's personal knowledge and stating that even if counsel's questions were improper, they "were of 'merely tangential importance' to the case itself and did not 'irreversibly inject' counsel's credibility as an issue in the trial"). Here, Retained Counsel's theoretical testimony about the discovery violation and what he told Tamilyn about the propriety of her having the disk was not "necessary," nor would it have gone to an "essential fact." *Garza*, 373 S.W.3d at 118 (party seeking

33

disqualification of opposing counsel must "establish[] both a genuine need for the attorney's testimony and that the testimony goes to an essential fact"); *Bahn*, 13 S.W.3d at 873 (discussing Rule 3.08 in civil case); *cf. Gonzalez*, 117 S.W.3d at 843 (approving lower courts' tacit finding that "the record supported the conclusion that it would be necessary for the State to call [the] attorney . . . as a witness [to the meetings with the key witness] if he did not put himself on the stand"; it "would have been evident that [the] attorney . . . was involved in the conversations about which [the witness] testified").

And despite the State's argument, the discovery violation's circumstances were tangential and unnecessary even to show that Love attempted to tamper with witnesses, which the State wanted to use as consciousness-of-guilt evidence. The attempt itself is what was important, not the facts underpinning it.

The State argued that the discovery violation would necessarily come into play because it was Tamilyn's having unfettered access to the file that prompted Love to ask her to send witnesses away or instruct them to clam up if they testified at Brooks's trial. The State claimed, relatedly, that its evidence would be truncated and its case prejudiced unless it could go into how Tamilyn came to possess the discovery and how her sharing it with Love contextually explained his tampering attempt. We are not persuaded.

Like any witness or prospective witness, Tamilyn was allowed to "view the information provided under" Article 39.14(a), which includes "any offense reports,

any designated documents, papers, written or recorded statements of the defendant or a witness, . . . or any designated books, accounts, letters, photographs, or objects or other tangible things not otherwise privileged" that are relevant and within the State's possession. *See* Tex. Code Crim. Proc. Ann. art. 39.14(a), (f). The statute places only two limits on witness access to this information: defense counsel cannot let a witness keep a copy of anything other than his or her own statement; and when viewing the materials, the witness cannot be allowed to see anyone else's "address, telephone number, driver's license number, social security number, date of birth, and any bank account or other identifying numbers contained in the document or witness statement." *See id.* art. 39.14(f). As we know, Tamilyn downloaded the entire file.[13]

But had Retained Counsel followed statutory protocol by having Tamilyn review a properly redacted DVD at his office, she still would have known (a) who the State's witnesses were, (b) what they had said in their statements, and (c) everything else except specific identifying information (address, etc.) that is not alleged to have been used in any way. Love might not have heard Tamilyn read verbatim witness statements or other file materials to him, but he could certainly have heard Tamilyn

---

[13]We also know that Retained Counsel failed to redact address, phone number, and other protected information from the DVD before letting Tamilyn have it, but the record does not suggest that she or Love or anyone else learned something personally identifying about a witness that they did not already know. This particular infraction thus has even less to do with Retained Counsel's disqualification.

summarize the file's contents and statements the witnesses had given to law enforcement.

And it hardly needs pointing out that *Love himself* had the right to know what was on the DVD. *See id.* (providing that defense counsel "may allow a defendant . . . to view the information provided under this article[] but may not allow [the defendant] to have copies"). Some logistical hurdles were certainly presented by Love's being in jail and by the amount of information on the DVD, but the point remains: if Retained Counsel had gone over the file with Love directly, Love would have had exactly the same information and exactly the same motivation to tell Tamilyn to get the witnesses out of town or encourage them to have memory lapses.

We see no straight line between Retained Counsel's violation of Article 39.14(f) and Love's attempt to tamper with witnesses; the former was neither a cause of nor a precondition for the latter. And because the record is devoid of anything implicating Retained Counsel himself in possible witness tampering, whatever he might have said to Tamilyn when lending her the DVD does not transmute the discovery violation into something that is material to Love's attempted tampering.

The State points to one conversation recorded after Tamilyn had turned State's evidence in which a clearly unhappy Love promised Tamilyn that he and Retained Counsel were going to make her misuse of the discovery an issue at trial, apparently as a way to damage her credibility or otherwise cause mischief. The State claims that this threat, if it materialized, would have required it to call Retained Counsel as a witness

36

to rebut any misimpression that Tamilyn had gotten the file from the State. But we cannot see any incentive for Love and Retained Counsel to point fingers at Tamilyn on this score; opening this can of worms only to have Retained Counsel's discovery violation revealed could well have prejudiced Love by showing defense attorneys in a poor light generally and by showing that the miscreant attorney was one whom Love had chosen and paid for. Besides, Love had other ways to undermine Tamilyn's credibility, such as her own criminal history and plea bargain to stay out of prison, if trashing his wife ended up being his trial strategy.[14]

As for any possible conflict between Love and Retained Counsel, Love was present at the disqualification hearing, heard Retained Counsel oppose the State's motion, and implicitly agreed that his chosen lawyer should remain on the case.[15] *Cf.*

---

[14]Indeed, Love's threats to Tamilyn did not materialize when she testified against him at his trial. Neither side asked about her viewing the DVD or sharing its contents.

[15]The State's concern that Love was setting the stage for a later postconviction writ was speculative. We do not believe that such a future possibility suffices to override a defendant's choice of retained counsel in the present. *See Aguirre v. State*, No. 11-11-00313-CR, 2013 WL 5776948, at *1 (Tex. App.—Eastland Oct. 24, 2013, no pet.) (mem. op., not designated for publication) ("Under the doctrine of invited error, Appellant is estopped from complaining that her counsel rendered ineffective assistance of counsel due to the purported conflict of interest."). Additionally, the disqualification hearing's focus was never on whether Love waived a conflict or whether the trial court should accept or decline it. *See Wheat*, 486 U.S. at 163, 108 S. Ct. at 1699; *Bowen*, 343 S.W.3d at 812. "The issue of informed consent is not a matter to be decided by the court at a disqualification hearing, but is a matter to be decided between the client and the attorneys." *Bahn*, 13 S.W.3d at 873.

*Bowen*, 343 S.W.3d at 816–17 (granting mandamus when trial court disqualified defense counsel on State's motion despite clients' waiving conflict).

The State itself would have faced some risk in placing Retained Counsel's conduct before the jury, for it could be seen as "attacking the defendant over the shoulders of counsel," which is improper. *Fuentes v. State*, 664 S.W.2d 333, 335 (Tex. Crim. App. [Panel Op.] 1984) ("The prosecutor's comment was calculated to convey . . . the impression that [defense] counsel acted in bad faith as a matter of course . . . . It is axiomatic that the State may not strike at a defendant over the shoulders of his counsel or accuse defense counsel of bad faith and insincerity."); *Crutcher v. State*, 481 S.W.2d 113, 117 (Tex. Crim. App. 1972) ("We do note the prosecutor's argument personally attacking defense counsel in an effort to inflame the minds of the jury to the accused's prejudice should not be condoned."). The State acknowledged these concerns at the disqualification hearing but argued them as an affirmative basis to disqualify Retained Counsel and not as a basis to make the discovery violation off limits during the trial.

Allegations of a disciplinary-rule violation or evidence showing only a possible future violation do not suffice for disqualification. *See Gonzalez*, 117 S.W.3d at 837. Moreover, raising the discovery violation at trial would have been unnecessary, and a party cannot invite prejudice by "unnecessarily calling the opposing counsel as a witness." *See id.* at 838. Additionally, disqualification "should not be used as a tactical weapon to deprive the opposing party of the right to be represented by the lawyer of

his or her choice." *See* Tex. Disciplinary Rules Prof'l Conduct R. 3.08 cmt. 10. As an example, comment 10 notes that a lawyer should not seek an opponent's disqualification under Rule 3.08 "merely because the opposing lawyer's dual roles may involve an improper conflict of interest with respect to the opposing lawyer's client, for that is a matter to be resolved between lawyer and client or in a subsequent disciplinary proceeding." *Id.* Here, the State was using the violation as a tactical weapon rather than leaving any potential conflict-related problem between Retained Counsel and Love to the realm of a later disciplinary proceeding, where it belonged.

Although we must defer to the trial court's findings, its finding that Retained Counsel was "a likely witness in the trial" is not supported by the record and is unreasonable. More important, being a "likely witness" is not the right formulation. Before a trial court invokes Rule 3.08 to deprive a criminal defendant of his chosen counsel, the attorney should be a *necessary* witness on an *essential fact. See id.* R. 3.08(a). This foundational requisite is wholly absent here, and for this reason alone the trial court abused its discretion in granting the State's disqualification motion.

## B. The risk of any prejudice to the State was minimal.

Even if Retained Counsel's testimony might have been necessary on some essential fact—which it was not—the State still had to show that counsel's continued representation would prejudice the State before disqualification was appropriate. *See Gonzalez,* 117 S.W.3d at 837. The court of criminal appeals described as follows what such prejudice to the State in the dual-role circumstance might look like:

If counsel [testifies], the State [is] prejudiced not only by the undue weight jurors might . . . attach to counsel's testimony, but also by the confusion that would most likely . . . result[] during argument regarding whether counsel [is] summarizing evidence or further testifying as to personal knowledge. However, even if [an] attorney . . . [does] not testify, but refer[s] to his own recollection of the events through cross-examination, the State [is] prejudiced by the implication to the jury that his questions represent[] the truth based on his personal knowledge of what had occurred. The State [is thereby] prejudiced by the inability to clarify counsel's testimony and impeach counsel's credibility. Counsel's personal knowledge regarding [the disputed issue affects] the jury's perspective . . . on the credibility of [witnesses].

*Id.* at 840.

But let's say that Retained Counsel stayed on the case and testified—as at the disqualification hearing—that he lent Tamilyn the discovery disk as a matter of convenience, that he told her not to copy the DVD and that he needed it back, and that he did *not* tell her that allowing her to possess the DVD was "highly not allowed," or words to that effect. At most, a "he said, she said" situation would have arisen on that latter point—a point that had nothing to do with Love's attempted witness tampering. In our view, whether a jury believed Tamilyn or Retained Counsel on a snippet of conversation that was a side issue would not have prejudiced the State or in any way undermined its ability to get a conviction.

We have a similarly hard time seeing how Retained Counsel's being an "unsworn witness" would have harmed the State's case. If Tamilyn testified that Retained Counsel had told her that possessing the DVD was improper, she had still conceded at the disqualification hearing that she was given Retained Counsel's lone

40

DVD, knew that he had not made a copy for her to keep, and had been told that Retained Counsel had to have it back. Questioning that might have been designed to make her out to be a liar on the "highly not allowed" paraphrase strikes us as pointless and irrelevant, and not a line of inquiry that would have helped Love's defense (or harmed the State's prosecution) one bit.

The State argues that evidence of Tamilyn's possessing and interacting with the discovery file and discussing its contents with Love and others were "inextricable contextual components of the critical evidence showing that Love, realizing that he was 'fucked' based on the information Tamilyn had read him from [the] file[,] instructed her to hide witnesses and to suppress testimony, establishing his consciousness of guilt." From this position, the State contends that "[e]ither [Retained Counsel's] testimony about those matters, as a sworn witness, or his representations about them, as an unsworn witness during questioning and without subjecting himself to cross-examination, would have confused the jury and would have prejudiced the State." But the State's claim of prejudice hinges entirely on the notion that what Tamilyn did with information from the discovery file, and Love's reaction to that knowledge, would not have been possible without Retained Counsel's Michael Morton Act violation. We are unpersuaded for reasons already explained, chief among them that both Tamilyn and Love were entitled to view the witness statements all along.

41

In *Gonzalez*, the State "intended to introduce the bribery evidence [in which defense counsel had direct, personal involvement] as evidence of appellant's consciousness of guilt." *Id.* at 846. Here, the State argued that it intended to introduce the witness-tampering evidence—of which Retained Counsel had no knowledge—as evidence of Love's consciousness of guilt. Retained Counsel knew only that he had given the discovery disk to Tamilyn with instructions for her to bring it back and not show it to anyone, which is not evidence of Love's consciousness of guilt. It is this disconnect between the evidence that Retained Counsel could theoretically have offered and what the State wanted to show that substantively distinguishes this case from *Gonzalez*.

At the disqualification hearing and also before us, the State expressed additional concerns that the discovery violation might impact Tamilyn's and Selser's testimony. But these concerns would have existed even without the violation: as the prosecutor's chief investigator admitted during the hearing, because they were witnesses, both Tamilyn and Selser could have properly reviewed a redacted copy of the Article 39.14 discovery. *See* Tex. Code Crim. Proc. Ann. art. 39.14(f).

And if a witness's trial testimony deviates from what the witness has said previously, attorneys challenge these inconsistencies with the witness's earlier statements, recorded interviews, or testimony. Both Tamilyn and Selser had given statements to detectives in August 2015. Both had testified before the grand jury— twice, for Tamilyn. And both had testified at Brooks's trial. To show any

inconsistencies, neither the State nor Love needed the discovery violation in order to impeach Tamilyn or Selser.

On the facts of this case, we hold that the State did not satisfy its burden to show prejudice if Retained Counsel was not removed from representing Love.

**C.     The State had other ways to show Love's attempted witness tampering without raising Retained Counsel's Michael Morton Act violation.**

As we have pointed out, although Love and Tamilyn had discussed both attempted witness tampering and the (tangential) discovery violation, those two matters were not inextricably intertwined. The State could easily have offered Love's attempted witness tampering as evidence of consciousness of guilt without showing the discovery violation—and in fact that is what ended up happening when Love went to trial represented by appointed counsel.[16]

As a State's witness, Tamilyn testified truthfully that Love had asked her to encourage witnesses to leave the state or plead ignorance if they were forced to testify. That was an easy and direct way to show attempted witness tampering without tying it to any Article 39.14(f) violation.

---

[16]We recognize that we are to analyze the trial court's ruling based on facts existing at the time of that ruling and not on later developments. *See, e.g., Whitehead v. State*, 130 S.W.3d 866, 872 (Tex. Crim. App. 2004). But because the State was able in the end to show Love's attempted witness tampering without anyone's uttering a word about Retained Counsel's having given Tamilyn the file, we can observe without needing to speculate that the Article 39.14 problem was easily sidestepped.

43

The State also played portions of the phone-call recordings at Love's trial. Those portions show Love's asking Tamilyn to tamper with witnesses, but any reference to the underlying discovery violation was edited out, again demonstrating that a jury could hear, without confusion, about Love's attempted witness tampering completely divorced from the Article 39.14(f) situation. Avoiding the discovery violation was salutary all the way around, really: unnecessarily going into a violation that was immaterial to what the State wanted to show about attempted witness tampering might have caused jurors to question the judicial process's integrity, which is to be avoided. *See Gonzalez*, 117 S.W.3d at 836.

In any event, whether the State could have dealt with the discovery violation by any number of less drastic means than seeking Retained Counsel's disqualification is a factor to consider only if the State has shown that (a) defense counsel is a necessary witness to an essential fact, and (b) the State will be prejudiced by the continued representation. *See id.* at 845 ("As long as the basis for the disqualification is adequately shown by the record, the trial judge need not expressly state its consideration of less drastic alternatives in the record."). Because the State did not make these fundamental showings, we need not dwell in any detail on the precise contours of what the trial court might have done to ameliorate the situation.

## D. Disqualification constituted an abuse of discretion.

We hold that the trial court's disqualifying Retained Counsel constituted an abuse of discretion. Retained Counsel was not a material or necessary witness on any

44

material or essential fact, nor did the State establish prejudice. On this record, remedies short of disqualification were available. *See id.* at 837. Nor was the potential for conflict serious. *See Bowen*, 343 S.W.3d at 815 ("On the facts presented here, however, [when defendants had consented to counsel's representation even though counsel had previously represented a key prosecution witness in an unrelated criminal matter,] the potential for such a conflict is not serious.").

## E.    The error was structural; the harm was reversible.

The United States Supreme Court has had "little trouble" concluding that the erroneous deprivation of the right to chosen counsel "unquestionably" qualifies as structural error. *Gonzalez-Lopez*, 548 U.S. at 150, 126 S. Ct. at 2564. The consequences are necessarily "unquantifiable and indeterminate." *Id.*, 126 S. Ct. at 2564. When it comes to investigating, developing the defense's theory, selecting the jury, presenting the witnesses, and arguing to the jury, different attorneys pursue different strategies. *Id.*, 126 S. Ct. at 2564. And the choice of attorney affects whether and on what terms the defendant cooperates with the prosecution, bargains for a plea, or decides to go to trial. *Id.*, 126 S. Ct. at 2564.

Because the erroneous denial of counsel bears on a representation's myriad aspects, the denial directly impacts the framework within which the trial proceeds—or whether it proceeds at all. *Id.*, 126 S. Ct. at 2564–65. Knowing the different choices that the disqualified counsel would have made and quantifying their impact on the proceedings' outcome is not possible. *Id.*, 126 S. Ct. at 2565. Many counseled

45

decisions, including those involving plea bargains and cooperation with the government, do not even concern trial conduct at all. *Id.*, 126 S. Ct. at 2565. A harmless-error analysis in such a context would be a speculative inquiry into a what-if universe. *Id.*, 126 S. Ct. at 2565.

We sustain Love's first issue, reverse the trial court's judgment, and remand the cause to the trial court for a new trial.

## ISSUES TWO AND THREE

Because Love's second and third issues, even if sustained, could not afford him any greater relief than his first issue, we need not address them. *See* Tex. R. App. P. 47.1.

## Conclusion

We reverse the trial court's judgment and remand the cause to the trial court for a new trial.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Publish

Delivered: March 26, 2020